Filed 3/28/13  P. v. Pina CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE PINA et al.,<br><br>    Defendants and Appellants.</td><td>B235751<br><br>(Los Angeles County<br>Super. Ct. No. BA360819)</td></tr>
</table>

APPEALS from judgments of the Superior Court of Los Angeles County. Michael E. Pastor and Gail Ruderman Feuer, Judges.  Affirmed with instructions.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Jorge Pina.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant Justin Carlin.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Jorge Pina (Pina) and Justin Carlin (Carlin) (collectively defendants) appeal from their convictions of attempted murder (Pina only) and assault by means likely to produce great bodily injury (both defendants). Defendants challenge the sufficiency of the evidence to support a finding that the victim suffered great bodily injury. They also challenge the finding that the crimes were gang related, asserting that the "mirroring" hypothetical facts presented to the expert witness for his opinion were improper because they too closely resembled the facts in evidence. Pina and respondent also point to errors in the amended abstract of judgment and seek an order correcting them. We agree that the amended abstract contains errors and we order the superior court to issue a corrected abstract of judgment. However, we conclude that substantial evidence supported a finding of great bodily injury and that the hypothetical question was proper. We thus reject defendants' remaining contentions and affirm the judgments.

## BACKGROUND

**Procedural history**

Defendants were charged in count 1 of an amended information with the willful, deliberate and premeditated attempted murder of Eileen Vargas (Vargas), in violation of Penal Code sections 664 and 187, subdivision (a).[1] It was further alleged as to count 1 that a principal personally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1).[2] In count 3, defendants were charged with an assault against Vargas by means likely to produce great bodily injury, in violation of former section 245, subdivision (a)(1).[3] It was further alleged that Pina personally used a

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

[2]    Count 2, in which Pina was charged with the attempted willful, deliberate, and premeditated murder of a different victim, was severed and tried separately.

[3]    At the time of the offense, section 245, subdivision (a)(1), punishes assaults "with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury . . . ." In the current version of section 245, punishment for assaults by means of force likely to produce great bodily injury is found in subdivision (a)(4).

2

firearm within the meaning of section 12022.5, subdivision (a). As to both counts the amended information alleged that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). In addition, as to both counts, it was alleged that defendants personally inflicted great bodily injury on the victim, within the meaning of section 12022.7, subdivision (a).

The amended information alleged that Pina had three prior felony convictions and Carlin two prior felony convictions, for which they served prison terms within the meaning of section 667.5, subdivision (b). The trial court granted motions to bifurcate trial on the prior convictions and prison terms.

Prior to verdict on the People's motion, the trial court struck the allegation of great bodily injury from count 1. The jury found Pina guilty of both counts as charged and found true the allegations that Pina personally used a firearm in the commission of both offenses, and that both offenses were gang related. The jury also found true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation, and the allegation that Pina personally inflicted great bodily injury on Vargas in the commission of count 2.

The jury acquitted Carlin of attempted murder as charged in count 1, but found him guilty of count 3 as charged. The jury found true the allegations that the crime was gang related and that Carlin personally inflicted great bodily injury on Vargas. Both defendants waived trial of the prior prison term allegations and admitted them.

The trial court sentenced Pina on count 1 to an indeterminate term of life in prison with a minimum parole eligibility period of 15 years due to the gang finding, plus a consecutive 20-year term for the personal discharge of a firearm, and three consecutive one-year terms due to the prior prison terms. An additional firearm enhancement of 10 years was stayed. The total determinate term as to count 1 was 23 years in prison. As to count 3, the trial court imposed a concurrent term of 24 years in prison, consisting of the

3

upper term of four years, plus 10 years for the personal use of a firearm, pursuant to section 12022.5, subdivision (a), and 10 years due to the gang finding.[4]

On November 17, 2011, the trial court sentenced Carlin to a total prison term of 14 years, comprised of the upper term of four years, plus a consecutive term of 10 years due to the gang finding. The trial court struck the prior prison term allegations for purposes of sentencing. The trial court imposed mandatory fines and fees on both defendants, ordered both defendants to provide biological samples and thumb and palm impressions, ordered victim restitution, and awarded custody credits.

Both defendants filed timely notices of appeal.

**Relevant prosecution evidence**

*The Avenues gang*

The prosecution's gang expert, Los Angeles Police Department (LAPD) Officer Robert Morales, testified about the Avenues gang, criminal street gangs in general, and defendants' membership in the gang. Officer Morales testified that with 700 documented members, the Avenues gang was a criminal street gang that operated in northeast Los Angeles. Drew Street was an important part of the gang's territory, as one of its several cliques operated there. The area had prearranged routes, look-out posts, and holes in fences which served to facilitate escape, making it easier to commit crimes there. Avenues gang members often congregated in a residential area of Drew Street, where they loitered, conducted gang business, and generally intimidated the residents (citizens) who were not members of the gang.

---

[4] Pina was sentenced four times. The trial court initially sentenced Pina on April 26, 2011, but recalled the sentence to correct an error, and resentenced him on June 2, 2011. That sentence was recalled and Pina was resentenced on June 22, 2011, as the court had neglected to impose a firearm enhancement under section 12022.5, subdivision (a), which was mandatory. (See *People v. Ledesma* (1997) 16 Cal.4th 90, 100-102.) On July 27, 2011, another department of the Los Angeles County Superior Court resentenced Pina to the same terms as part of a plea agreement in another case, No. BA372854. Through apparent oversight however, that court neglected to include the firearm enhancement. See Discussion under section III, *infra*.

Proclaiming "This is my neighborhood" or "This is my hood" was a common way to claim or refer to claimed territory. The term "homeboy" usually denoted a fellow gang member. Like other street gangs, the Avenues gang protected its territory from rival gangs that might otherwise compete in the primary activities by which the gang earned money, usually selling narcotics. Other primary criminal activities of the Avenues gang included shootings, beatings, stabbings, loitering, drinking, urinating in public, and graffiti painting. Graffiti served to mark the gang's territory and warn rivals to stay out. The gang's common signs and symbols included a picture of skull, often wearing a fedora, and the following words and letters: "Avenidas" or "Los Avenidas" (Spanish for Avenues or the Avenues); "A's"; "Avenues"; and "LA", sometimes in the form of the logo of the Los Angeles Dodgers. The number "57" was a common symbol for one of the gang's cliques.

Intimidation and fear were significant aspects of gang life, the primary means used to keep rivals out, especially from Drew Street, and to keep citizens from reporting crimes to the police. Officer Morales explained that respect was an extremely important concept to most gang members, albeit in a "twisted" form. Retaliation was the norm when a gang member perceived disrespect, and disrespect toward one member was considered disrespect toward the entire gang. Gang members were required to punish the person showing disrespect, whether that person was a fellow gang member, a rival, a citizen, or even a woman; otherwise the disrespected gang member could be punished for being unsupportive of the gang for being a coward. Punishment usually came in the form of a beating, stabbing, or shooting, and disrespect occurring in Avenues territory could bring more severe punishment. Shootings and killings earned the highest respect within the gang.

Officer Morales testified he knew Pina from prior personal contacts, and Pina had admitted he was a member of the Avenues gang. Pina's tattoos signified his membership in the gang, and included "Avenues" under his lower lip, a skull wearing a fedora is on his chest, and the Dodgers "LA" logo on his right forearm.

5

Although Officer Morales had had no personal contact with Carlin, it was his opinion that Carlin was also a member of the Avenues gang. He based his opinion on his expertise, LAPD resources, speaking to other gang officers, and observing Carlin's tattoos, which included a "5" and a "7" under his eyes, "LA" on his right hand, "Aves" on his right arm and finger, an "A" on the back of his head, a skull on his right arm, and "Avenues" on his abdomen.

LAPD Officer Fernando Salcedo testified that Carlin admitted that he was an Avenues gang member to Officer Salcedo when he was stopped and questioned on Drew Street the night of August 21, 2009. Carlin was dressed as many Avenues gang members dressed, wearing a blue "LA" baseball cap, a blue Dodgers shirt, baggy blue jeans, and white shoes.

Evidence of the convictions of two other Avenues gang members, one for robbery and car theft, and the other for robbery and assault with a deadly weapon, a handgun, was admitted.

### The crimes

On August 20, 2009, Vargas had lived in an apartment on Drew Street with her two young children for about four months. Sometime between 2:00 and 3:00 a.m., she was awakened by the sounds of a party outside. She could hear someone talking and urinating near her front window. Vargas went outside to investigate, and saw about 20 men in the driveway near her front window, drinking beer. Upset, Vargas confronted the men and told them not to urinate near her window because she had children there. She felt that the issue was resolved and went back to bed. The next morning, after seeing that the tires of her car had been slashed, she filed a police report.

On August 22, 2009, at approximately 2:30 a.m., Vargas was asleep in her apartment when she was again awakened by noise near her bedroom window. She heard someone urinating, looked out the window, and saw a man she later identified as Carlin. Vargas went outside to talk to him and observed him with another man, whom she identified as Pina. When she angrily confronted Carlin, he placed his face directly in front of her face and replied loudly, "Get the fuck out of here," and "This is my

6

neighborhood. Who do you think you are?" Vargas pushed Carlin away from her, and then Pina drew a pistol, waived it in her direction, approached her, and said, "What are you doing to my homeboy?" When she tried to walk away, Pina came up behind her and said, "You, fucking bitch" and "Didn't [you] learn [your] lesson?" He hit her in the face, she fell, and then Carlin hit her as well. The two men kicked her all over her body, but mostly in her stomach and face.[5]

When defendants spoke to a neighbor who had called out from a window, Vargas got up and ran toward the street. Pina pursued saying he was going to kill her. Pina also said, "Come on Flea. Let's go," and Carlin followed. When Vargas reached the street she yelled that she was going to call the police. She then heard gunfire, six or seven shots in all. Just before hiding behind a parked truck, she saw that Pina was the shooter. From her position on the ground, she could see both defendants' feet. When the shooting stopped and she no longer saw defendants' feet, she ran home and called the police.

### Vargas's injuries

Vargas was taken by ambulance to the hospital, where she was treated and released later the same day. As a result of her beating, Vargas suffered a cut on her upper lip that required six stitches and left a scar. She suffered facial abrasions, one eye was bruised and swollen shut, her nose was crooked but not broken, and she suffered bruises on her arm, abdomen, and back. Vargas testified that for two months, her face hurt and she felt dizzy.

### Gang expert's opinion

The prosecutor presented Officer Morales with a lengthy hypothetical factual scenario that closely tracked the evidence presented in the case. Officer Morales opined that the crimes described in the hypothetical question were committed in furtherance of

---

[5] At trial, Vargas testified that Pina did not hit her with his gun, but the parties stipulated that Officer Salcedo wrote in his report that when he interviewed Vargas on the morning of the assault, she stated "'that she was also being pistol-whipped by a black nine millimeter handgun and saw the gun very clearly.'"

7

the Avenues gang.[6] His opinion was based upon the fact that the two gang members had acted in concert to commit a crime that intimidated the victim and instilled fear in her, sending the message to the community that they could do whatever they wanted in the area they controlled. In addition, retaliation against the victim for stating that she would call the police would send a message to the community that being a "snitch" had consequences.

Officer Morales also opined that the described crimes would benefit the gang members and enhance their reputations by showing allegiance to the gang and a willingness to support other members. Committing such crimes with another gang member supported the gang by punishing the person perceived as disrespectful to one of its members. Such crimes also benefit the entire gang by enhancing its reputation in the community.

## DISCUSSION

### I. Substantial evidence of great bodily injury

Pina contends that the evidence was insufficient to support the jury's finding that defendants inflicted great bodily injury on Vargas. Carlin adopts Pina's argument.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

---

[6] Officer Morales referred to the two gang members described in the hypothetical question as "the two defendants" until the prosecutor told him to refer to them as the "two gang members." The trial court struck the reference to the defendants and admonished the jury disregard it.

8

As applicable here, "'great bodily injury' means a significant or substantial physical injury." (§ 12022.7, subd. (f).) "[S]ignificant or substantial [means] not insignificant, trivial or moderate. [Citations.]" (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) """Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding."' [Citations.]" (*People v. Escobar* (1992) 3 Cal.4th 740, 750 (*Escobar*).)

Pina points out that great bodily injury has been said to have essentially the same meaning as serious bodily injury. (See *People v. Burroughs* (1984) 35 Cal.3d 824, 831, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.) Serious bodily injury is defined in section 243, subdivision (f)(4), as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." Pina contends that Vargas did not suffer great bodily injury because she did not suffer any of the enumerated injuries in section 243. The contention has no merit. Serious bodily injury "*include*[*s*], *but* [*is*] *not limited to*" those injuries enumerated in the statute. (§ 243, subd. (f)(4), italics added.)

Pina acknowledges that injuries are not trivial or minor merely because they do not cause permanent, prolonged or protracted disfigurement, impairment or loss of bodily function. (See *Escobar*, *supra*, 3 Cal.4th at pp. 749-750.) Nevertheless, he argues Vargas's injuries were minor or merely moderate because they were not as "significant or substantial" as in *People v. Le* (2006) 137 Cal.App.4th 54, 57-59, where the victim suffered a soft tissue gunshot wound, affecting his ability to walk for seven weeks. Pina minimizes Vargas's injuries as "only bruises, a swollen eye, and a cut on or above her lip" which "did not require *extensive* suturing" or cause "any serious disfigurement." Pina argues that Vargas's injuries were comparable to those of the victim in *People v.*

*Martinez* (1985) 171 Cal.App.3d 727, 735, who suffered a stab wound through clothing, causing a minor laceration.

We reject Pina's attempt to dismiss Vargas's injuries as minimal. In fact, she suffered abrasions on her face, as well as multiple bruises on her arm, abdomen, and back. At the hospital, Officer Salcedo observed that Vargas was incoherent and appeared to be in pain. The injury to her upper lip required six stitches and left a scar on her face, one eye was swollen shut, her nose looked misshapen, and she was in prolonged pain with dizziness. Similar injuries have been found to amount to great bodily injury. (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836-837 [multiple bruises, contusions, swelling, and discoloration].) And injuries of comparable severity have amounted to great bodily injury. (See *People v. Harvey* (1992) 7 Cal.App.4th 823, 827 [blistering second degree burns]; *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733 [multiple abrasions, bruises, and lacerations, a scratch and a swollen eye]; cf. *People v. Corona* (1989) 213 Cal.App.3d 589 [a swollen jaw, bruises to head and neck and sore ribs].)

"A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description. Clearly it is the trier of fact that must in most situations make the determination." (*People v. Jaramillo*, *supra*, 98 Cal.App.3d at p. 836; see also *Escobar*, *supra*, 3 Cal.4th at p. 752.) We conclude that the evidence was sufficient to support the jury's determination.

## II. Gang expert's opinion

Both defendants contend that the trial court erred by permitting Officer Morales to give his opinion that the crimes described in a lengthy hypothetical question would have been committed for the benefit of, in association with, or at the direction of the Avenues gang. Each defendant joins in the arguments of the other.

In particular, defendants contend that the hypothetical facts precisely mirrored the evidence to such an extent that the expert was asked, in essence, to give an opinion on ultimate factual issues that should have been left to the jury. Defendants contend that the resulting opinion violated their rights to due process and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution.

10

In addition, Pina contends that to the extent defense counsel failed to interpose effective objections to the hypothetical question and the subsequent opinion, he was denied his Sixth Amendment right to effective assistance of counsel.[7] Rather than find a forfeiture and reach Pina's claim of ineffective assistance of counsel, we discuss the issues and conclude that they lack merit. (See *People v. Hardy* (1992) 2 Cal.4th 86, 208-209.)

We agree with respondent that defendants' challenge to the mirroring of the evidence against them is foreclosed by *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), in which the California Supreme Court rejected criticism of such detailed hypothetical questions. In *Vang*, as here, "[t]he only apparent differences between the trial testimony and the hypothetical were the names of the parties." (*Id*. at p. 1045.) The court held: "It is required, not prohibited, that hypothetical questions be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (*Id*. at p. 1041.) Hypothetical questions must "be based on what the evidence showed *these* defendants did, not what someone else might have done. . . . Disguising this fact would only have confused the jury." (*Id*. at p. 1046.) Thus, "[h]ypothetical questions must not be prohibited solely because they track the evidence too closely, or because the questioner did not disguise the fact the questions were based on the evidence." (*Id*. at p. 1051.)[8]

---

[7]  Both defendants' objections were cryptic and did not clearly challenge the mirroring of the evidence against them. Carlin's counsel "object[ed] to the hypothetical the way it is stated at the conclusion asking for the opinion"; Pina's counsel joined the objection and stated, "it is a legal conclusion." After the trial court overruled the objections, Pina's counsel restated her objection as "calling for a legal conclusion as to the acts involved, not the hypothetical itself."

[8]  Pina suggests that *Vang* was wrongly decided, as demonstrated by Justice Werdegar in her concurring opinion. (See *Vang*, *supra*, 52 Cal.4th at pp. 1052-1054, (conc. opn. of Werdergar, J.).) We are bound by the majority's decision and decline any invitation to reject it. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

11

Defendants contend that the hypothetical question was improper even when reviewed under the *Vang* standards. Pina contends that the effect of Officer Morales's testimony amounted to no more than his personal belief that defendants were guilty of the crime and that they committed it for gang reasons. Carlin contends that the expert's opinion that the crime was committed for a gang purpose was improper "because the jurors were just as able to decide that ultimate issue"; and because "his opinion carries the imprimatur of the government [which] invites the jurors simply to trust his judgment rather than deciding the matter for themselves."

As respondent notes, this contention is also foreclosed by *Vang*. Expert testimony does not become inadmissible simply because it embraces the ultimate issue to be decided by the jury. (*Vang*, *supra*, 52 Cal.4th at pp. 1048-1049.) The Supreme Court explained that although an expert who was not at the scene and thus has no personal knowledge cannot testify directly whether the defendants committed the crime, he may "express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose. 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.] It is true that [the] opinion, if found credible, might, together with the rest of the evidence, cause the jury to find the assault was gang related. 'But this circumstance makes the testimony probative, not inadmissible.' [Citation.]" (*Vang*, *supra*, 52 Cal.4th at pp. 1048-1049; see also *id*. at p. 1045.)

Pina contends that Officer Morales did not in fact base his opinion on hypothetical facts, hypothetical defendants, or a hypothetical victim. Pina claims that this was demonstrated by Officer Morales's reference to "those two defendants" after the prosecutor asked for his opinion. Pina further contends that the prosecutor sought to confirm that Officer Morales was referring to the actual defendants and actual facts in evidence by asking, "By those two gang members?" And he suggests that the reply, "Correct," provided such confirmation.

Although Pina cites *Vang* for the contention that it would have been error for Officer Morales to testify directly about him and Carlin, *Vang* expressly left this question open. (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.) However, there is no need to reach that issue, as Pina's characterization of the exchange is contradicted by the record, which makes clear that the prosecutor did not seek to confirm that Officer Morales was referring to defendants Pina and Carlin; rather she was making it clear that Officer Morales should refer to the two hypothetical gang members, not to the defendants. After the exchange cited by Pina, when Officer Morales once again referred to "the two defendants," the prosecutor interjected, "Just refer to them as two gang members. The two gang members." As Pina acknowledges, the trial court intervened at that point, stating, "Just a moment, please. I'll strike out any reference to the defendants. That is stricken, ladies and gentlemen. Disregard any reference to that."

Thus, it was clear that when Officer Morales was referring to the hypothetical perpetrators, he inadvertently called them the two defendants, and the court clarified for the jury. It was apparently clear to defense counsel, as well, as no objections were made. Moreover, in her cross-examination of Officer Morales, Pina's counsel immediately raised the issue. When Officer Morales did not understand her questions, the court asked: "We are talking about two persons in a hypothetical. You understand that?" Officer Morales replied, "Yes." Counsel then asked, "We are talking about a hypothetical. You are not talking about my client? Do you get that?" Officer Morales confirmed, "Correct. It's a hypothetical." A few questions later, counsel asked, "[Y]ou have [no] personal knowledge of what was in my client's head at the time this incident occurred?" Officer Morales replied, "That's correct. I don't have personal knowledge."

Furthermore, defendants suffered no prejudice. The trial court instructed the jury with CALJIC Nos. 2.80 and 2.82, which, like the CALCRIM instructions given in *Vang*, adequately ensure that the jury will play its critical role in deciding "whether to credit the expert's opinion at all [and] whether the facts stated in the hypothetical questions are the

13

actual facts, and the significance of any difference between the actual facts and the facts stated in the questions."[9] (*Vang*, *supra*, 52 Cal.4th at p. 1050.)

Even without the hypothetical questions or Officer Morales's responses a different result would have been unlikely. A gang finding has two prongs: (1) the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 61, 67-68 (*Albillar*).) The first prong is satisfied with substantial evidence that a defendant committed the crime in concert with a known gang member; and the jury may reasonably infer the second prong from substantial evidence that a defendant intended to commit the crime with the other gang member. (*Albillar*, *supra*, at p. 68; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

Here, overwhelming evidence presented apart from the opinion elicited by the hypothetical questions, established that each defendant was a member of the Avenues gang, knew the other was a member of the gang, and committed an intentional assault on Vargas in concert with the other. Pina immediately came to the aid of Carlin when Vargas pushed him, both defendants hit and kicked her simultaneously while she lay on the ground, and both defendants chased her when she ran into the street. Both defendants

---

[9] The court read (in relevant part) as follows: "An opinion is only as good as the facts and the reasons on which it is based. If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable. In examining an expert witness, counsel may ask a hypothetical question. This is a question in which the witness is asked to assume the truth of a set of facts and to give an opinion based on that assumption. In permitting this type of question, the court does not rule, and does not necessarily find, that all of the assumed facts have been proved. It only determines that those assumed facts are within the possible range of the evidence. It is for you to decide from all the evidence whether or not the facts assumed in a hypothetical question have been proved. If you should decide that any assumption in a question has not been proved, you are to determine the effect of that failure of proof on the value and weight of the expert opinion based on the assumed facts."

14

had previously admitted to law enforcement that they were members of the Avenues gang. It was also apparent from visible gang related tattoos that both defendants were members of the Avenues gang. They were in Avenues gang territory when the crimes were committed. Each defendant must have known the other was a member of his gang. Further, Pina called Carlin by his gang moniker, "Flea," and referred to him as his "homeboy."

We conclude that not only were both prongs of the gang enhancement established by substantial evidence, the same evidence makes clear beyond a reasonable doubt that a rational jury would have found defendants guilty and the gang allegation true without the detailed hypothetical questions. We thus agree with respondent that if the trial court had erred, any such error would be harmless under any standard, even the stricter standard applied to constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24.

## III. Abstract of judgment

Pina asks that we order the trial court to correct the abstract of judgment to reflect the oral pronouncement of sentence. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) As to count 1, although the second court imposed the three consecutive one-year enhancements under section 667.5, subdivision (b), the abstract of judgment erroneously states that the three one-year enhancements were imposed pursuant to section 12022.53, subdivision (c).[10] As Pina also points out, the amended abstract incorrectly states that a consecutive term was imposed as to count 3, although the term was ordered to run concurrently with the term imposed on count 1.[11]

---

[10] The trial court's minutes of June 22, 2011, erroneously state that the prior prison term enhancements were imposed pursuant to section 12022.53, subdivision (c); and they do not state that the total term as to count 3 is to run concurrently with the term imposed on count 1.

[11] We also observe a typographical error: the amended abstract incorrectly states that the gang enhancement was imposed under the nonexistent section 1866.22, rather than section 186.22.

Respondent agrees that the errors cited by Pina should be corrected, but notes that the amended abstract fails to reflect the 10-year firearm enhancement of section 12022.5, subdivision (a), imposed as to count 3 on June 22, 2011.[12] We agree that the omission was an oversight and we order that correction as well.

## DISPOSITION

The judgments entered against both defendants are affirmed. With regard to defendant Jorge Pina only, the matter is remanded, and the superior court is directed to prepare an amended abstract of judgment reflecting the trial court's oral pronouncement of sentence on June 22, 2011. In particular, the corrected abstract shall contain the following: that the imposition of the three consecutive one-year enhancements in count 1 were imposed under section 667.5, subdivision (b); that a firearm enhancement was imposed on count 3 pursuant to section 12022.5, subdivision (a); and that the total term on count 3 was to run concurrently with the term imposed on count 1. The superior court is further directed to forward the amended abstract to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

---

[12] The sentencing judge in case No. BA372854 stated that she intended to incorporate the "same precise terms" imposed in this case, but she then apparently recited an earlier recalled sentence by mistake, and thus omitted the firearm enhancement.

16